People v Serrano (2021 NY Slip Op 07037)





People v Serrano


2021 NY Slip Op 07037


Decided on December 16, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:December 16, 2021

112587
[*1]The People of the State of New York, Respondent,
v
Luis Serrano, Appellant.

Calendar Date:October 19, 2021

Before:Garry, P.J., Lynch, Clark, Reynolds Fitzgerald and Colangelo, JJ.

Steven M. Sharp, Albany, for appellant.
P. David Soares, District Attorney, Albany (Peter H. Willis of counsel), for respondent.



Clark, J.
Appeal from a judgment of the County Court of Schenectady County (Sypniewski, J.), rendered May 17, 2019, upon a verdict convicting defendant of the crimes of assault in the first degree, criminal possession of a weapon in the third degree and criminal mischief in the fourth degree.
In July 2018, based upon allegations that he threw a piece of asphalt through the window of a car in which the victim was sitting, thereby shattering the glass and striking the victim in the head, defendant was charged with attempted murder in the second degree, assault in the first degree, criminal possession of a weapon in the third degree and criminal mischief in the fourth degree. After defendant unsuccessfully moved to suppress statements that he made to police, as well as two pretrial identifications of him from a photo array, the matter proceeded to a jury trial. Defendant was ultimately convicted of assault in the first degree, criminal possession of a weapon in the third degree and criminal mischief in the fourth degree.[FN1] He was thereafter sentenced, as a second felony offender, to a prison term of 15 years, followed by five years of postrelease supervision, for his conviction of assault in the first degree, and to lesser concurrent prison terms on his remaining convictions. Defendant appeals.
We affirm. Defendant challenges his conviction of assault in the first degree as unsupported by legally sufficient evidence and the entire verdict as against the weight of the evidence. Initially, defendant's legal sufficiency challenge is preserved only to the extent that he argues that the People failed to prove that he intended to cause serious physical injury to the victim and that he in fact caused such serious physical injury (see People v Iovino, 149 AD3d 1350, 1351 [2017], lv denied 30 NY3d 950 [2017]; People v Thiel, 134 AD3d 1237, 1238 [2015], lv denied 27 NY3d 1156 [2016]).[FN2] Nevertheless, as part of our weight of the evidence review, we necessarily assess whether each element of assault in the first degree, as charged in the indictment, was proven beyond a reasonable doubt (see People v Gray, 151 AD3d 1470, 1472 [2017], lv denied 30 NY3d 949 [2017], cert denied ___ US ___, 138 S Ct 1295 [2018]; People v Iovino, 149 AD3d at 1351).
In assessing a challenge to the legal sufficiency of the evidence, this Court views the evidence in the light most favorable to the People and evaluates "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged" (People v Bleakley, 69 NY2d 490, 495 [1987] [internal citation omitted]; see People v Abussalam, 196 AD3d 1000, 1004 [2021]; People v Terry, 196 AD3d 840, 841 [2021], lvs denied 37 NY3d 1027, 1030 [2021]). To determine whether a verdict is against the weight of the evidence, this Court "[*2]must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable and, if not, then weigh the relative probative force of conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony" (People v Terry, 196 AD3d at 841 [internal quotation marks and citations omitted]; see People v Bleakley, 69 NY2d at 495; People v Abussalam, 196 AD3d at 1004).
For a conviction of assault in the first degree, the People bear the burden of proving, as relevant here, that, "[w]ith intent to cause serious physical injury to another person," the defendant "cause[d] such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1]). Serious physical injury means impairment of a person's physical condition "which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10]; see Penal Law § 10.00 [9]). For a conviction of criminal possession of a weapon in the third degree, the People must prove that the defendant was previously convicted of a crime and that he or she has committed the offense of criminal possession of a weapon in the fourth degree (see Penal Law § 265.02 [1]), which requires proof that the defendant knowingly possessed a dangerous or deadly instrument or weapon with intent to use it unlawfully against another (see Penal Law §§ 15.05 [2]; 265.01 [2]; People v Saunders, 85 NY2d 339, 341-342 [1995]; People v Vandenburg, 189 AD3d 1772, 1773 [2020], lv denied 36 NY3d 1054 [2021]). Further, for a conviction of criminal mischief in the fourth degree, the People must prove that the defendant, "having no right to do so nor any reasonable ground to believe he or she has such right, . . . [i]ntentionally damages property of another person" (Penal Law § 145.00 [1]). With respect to the charges of assault in the first degree and criminal possession of a weapon in the third degree, a dangerous instrument "means any instrument . . . which, under the circumstances in which it is used, . . . is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [13]). "In determining whether a particular item [may be considered a dangerous instrument], the manner in which the item was used is of paramount consideration, in recognition that an object which is innocuous when used for its proper purpose may become dangerous when used to cause injury" (People v Ray, 273 AD2d 611, 613 [2000] [citations omitted]; see People v Carter, 53 NY2d 113, 116 [1981]).
The victim testified that, on the evening in question, he was parked on a street in the City of Schenectady, Schenectady County when he heard a knock on the vehicle's window and saw defendant, whom he later identified in a photo array, standing outside with an object in [*3]his hand. The victim testified that, based upon a past incident where he stole drugs and money from a delivery that he had made on defendant's behalf and defendant's threatening conduct toward him since, he became nervous and turned to unbuckle his seat belt and exit the car. The victim testified, however, that the next thing he remembers was waking up in the hospital "in really bad pain."[FN3]
To establish the events leading up to the victim's hospitalization, the People relied upon testimony from a father and son who witnessed the incident (hereinafter referred to as the older eyewitness and the younger eyewitness, respectively), a 911 dispatcher, the police officer who responded to the 911 call and two detectives involved in the investigation, as well as documentary evidence and certain inculpatory statements made by defendant following the incident. Specifically, the older eyewitness testified that, on the night in question, he observed an individual wearing dark clothing approach the driver side door of the vehicle and that, within seconds, he heard a loud noise and glass shattering. He stated that the younger eyewitness was arriving home at the time of the incident and that he thereafter called 911, relaying his observations as well as those of the younger eyewitness. The older eyewitness asserted that, upon prompting from the 911 dispatcher, he looked inside the vehicle and "[s]aw the victim slumped over in the passenger seat with blood coming out from behind his ear." The younger eyewitness similarly testified that, as he was driving down the road, about 100 feet away from the victim's vehicle, he heard a loud noise and saw the glass of the driver side window shatter. The younger eyewitness stated that he observed an individual, whom he later identified in a photo array as defendant, beside the shattered car window and saw that individual run past him. The younger eyewitness testified to looking inside the vehicle and thinking that the victim was dead because he saw "a pretty good wound behind [the victim's] ear," with "some meat hanging out." A recording of the 911 call was received into evidence and played for the jury during the dispatcher's testimony.
The police officer who responded to the 911 call testified that, upon arriving at the scene, he observed a vehicle parked with the engine running and a shattered driver side front window. He stated that the victim was slumped over the middle console area bleeding from his head and was uncommunicative. The officer testified that, after calling dispatch to expedite the medics, he broke the passenger side window to gain entry into the vehicle and turn the engine off and observed "a chunk of pavement in the car." He described the asphalt as being "about the size of a small dinner plate." A detective testified to arriving at the scene and observing "a loose piece of gravel or asphalt from the road" on the passenger side of the vehicle. Photographs of the damaged vehicle and the asphalt [*4]were admitted into evidence at trial. Another detective testified that defendant was identified as a suspect during the course of the investigation and that he subsequently conducted an interview of defendant. He stated that, during that interview, he showed defendant still images pulled from a nearby pole surveillance camera around the time of the incident and that defendant identified himself in several of the images, including one in which he is depicted bending down in an area with broken chunks of pavement.
With respect to the victim's injuries, a trauma surgeon at the hospital testified that a CT scan of the victim's brain revealed "a fairly complex skull fracture," which began at the mastoid process, extended into the temporal skull and continued into the basilar skull, where blood vessels and other major nerves enter the brain. The trauma surgeon testified that the victim also suffered a brain contusion and a subarachnoid hemorrhage in the cerebellum and occipital areas, which affect vision, locomotion and balance. He stated that, on day three of the victim's hospitalization, it was discovered that the victim had a venous sinus thrombosis — otherwise known as a clot — in the vasculature of the brain, which impedes blood flow out of the brain. The trauma surgeon further stated that the victim had a palsy of the cranial nerve, which affects movement of the eyes. According to the trauma surgeon, the victim's injuries were caused by blunt force.
As to his injuries, the victim testified that, since the incident, he has not been able to hear out of his left ear, the entire left side of his face is completely numb and food regularly falls out of his mouth when he is eating or drinking. He stated that, when he first woke up in the hospital, he could not see out of his left eye, which was crossed and facing to the right. He testified that, although he can now see out of his left eye and it is no longer crossed, his vision in that eye remains blurred and his eye drifts to the right at times. According to the victim, his left eye is discolored and he experiences itching and throbbing in that eye. The victim further testified to having balance issues, which made it difficult for him to walk at first and continues to cause him problems from time to time.
Viewing the evidence in the light most favorable to the People, we find that there was legally sufficient evidence from which a rational jury could conclude that defendant committed assault in the first degree (see Penal Law § 120.10 [1]). The medical evidence established that the victim sustained a serious physical injury caused by blunt force trauma, and there was ample evidence to conclude that defendant inflicted such injury by striking the victim in the head with a piece of asphalt, which, under the circumstances of its use, was a dangerous instrument that was readily capable of causing serious physical injury (see Penal Law §§ 10.00 [9], [10], [13]). Defendant's intent to cause serious [*5]physical injury to the victim "was readily inferable both from his actions and the severity of the victim's injuries" (People v Abussalam, 196 AD3d at 1006). As to defendant's weight of the evidence argument, we find that, given the overwhelming evidence of defendant's guilt, a different verdict would have been unreasonable (see People v Hadfield, 119 AD3d 1224, 1225-1226 [2014], lv denied 24 NY3d 1002 [2014]; People v Clark, 284 AD2d 725, 726-727 [2001]). In any event, even if a different result would have been reasonable, viewing the evidence in a neutral light and according deference to the jury's credibility determinations, the verdict is amply supported by the weight of the evidence (see Penal Law §§ 120.10 [1]; 145.00 [1]; 265.02 [1]; People v McCabe, 182 AD3d 772, 774 [2020]).
Defendant also contends that he was deprived of a fair trial as a result of the People's improper elicitation of testimony — from the detective who interviewed him — that he invoked his right to counsel and his right against self-incrimination. A defendant's invocation of his or her right against self-incrimination and/or his or her right to counsel during a custodial interrogation may not be used against him or her as part of the People's case-in-chief (see People v Lentini, 163 AD3d 1052, 1054 [2018]; People v Johnson, 70 AD3d 1188, 1190 [2010]; People v Murphy, 51 AD3d 1057, 1058 [2008], lv denied 11 NY3d 792 [2008]). This is because such evidence "creates a prejudicial inference of consciousness of guilt" (People v Hunt, 18 AD3d 891, 892 [2005]; see People v Lentini, 163 AD3d at 1054; People v Demagall, 114 AD3d 189, 202 [2014], lv denied 23 NY3d 1035 [2014]). However, the People's improper elicitation of the prejudicial evidence does not automatically result in a reversal of the judgment of conviction, even in the absence of a curative instruction or in the face of a deficient curative instruction (see e.g. People v Flower, 173 AD3d 1449, 1456 [2019], lv denied 34 NY3d 931 [2019]; People v Dashnaw, 85 AD3d 1389, 1393 [2011], lv denied 17 NY3d 815 [2011]; People v Murphy, 79 AD3d 1451, 1453 [2010], lv denied 16 NY3d 862 [2011]; but see People v Knowles, 42 AD3d 662, 664 [2007]).[FN4] Rather, any such constitutional error is subject to a harmless error analysis (see People v Peguero-Sanchez, 29 NY3d 965, 967 [2017]; People v Murphy, 79 AD3d at 1453; People v Hunt, 18 AD3d at 892), which requires this Court to consider whether there was overwhelming proof of the defendant's guilt and whether there was any reasonable possibility that the People's error may have contributed to the defendant's conviction (see People v Crimmins, 36 NY2d 230, 231 [1975]; People v Flower, 173 AD3d at 1456).
Here, there is no doubt that the People pursued an improper line of questioning by asking the detective who conducted defendant's custodial interrogation whether defendant indicated at some point during the interview that he no longer wanted to talk with the detective and wished [*6]to speak with an attorney (see People v Viera, 133 AD3d 622, 624 [2015], lv denied 26 NY3d 1151 [2016]; People v McLean, 243 AD2d 756, 756 [1997], lv denied 91 NY2d 928 [1998]). We, however, find the People's improper and prejudicial questioning to be harmless beyond a reasonable doubt.
The proof of defendant's guilt was overwhelming. Additionally, under all of the circumstances of this case, we are convinced that there is no reasonable possibility that the People's brief — yet improper — inquiry and elicitation of the prejudicial evidence might have contributed to the judgment of conviction. The People's improper line of questioning was not pervasive, and, following the detective's prejudicial testimony, the People made no attempt to highlight or exploit his testimony (see People v Masi, 151 AD3d 1389, 1390-1391 [2017], lv denied 30 NY3d 1062 [2017]; People v McLean, 243 AD2d at 757). Moreover, although defense counsel declined County Court's offer to give a curative instruction to the jury, stating that he believed it to be in defendant's "best interest to just let it go,"[FN5] County Court proactively took other measures to prevent any further prejudice to defendant. Indeed, following the sidebar, County Court sent the jury to the jury room so that the People could — outside the presence of the jury — instruct the detective to avoid any further testimony about defendant having invoked his rights to counsel and to remain silent. Accordingly, upon consideration of all of the foregoing, we find that the People's error was harmless beyond a reasonable doubt (see People v Flower, 173 AD3d at 1456; People v Viera, 133 AD3d at 624-625).
Next, defendant argues that the People impermissibly placed his criminal history before the jury by eliciting testimony that all of the photos included in the photo array that was shown to the victim and the younger eyewitness were taken from the "RICCI system" — a database that collects mug shots from New York. Although evidence of a witness's identification of a defendant in a properly conducted photo array procedure is admissible in the People's case-in-chief (see CPL 60.25, 60.30), the concern remains that a jury may infer from the photo array that the defendant was previously convicted of a crime (see generally People v Caserta, 19 NY2d 18, 21 [1966]). To ameliorate such concern, the defendant may request a limiting instruction, either at the time of the identification and/or during the trial court's final instructions (see CJI2d[NY] Identification — Identification by Pictorial Representation).
As the People correctly point out, the detective who compiled the photo array never explicitly testified that the photograph of defendant was a mug shot. However, the questions asked by the People and the answers given by the detective can lead to no other conclusion. Thus, under the circumstances of this case, we agree that the testimony was improper and that County Court should have sustained defendant's objection[*7], struck the testimony and issued a limiting instruction at that moment, rather than doing so after additional testimony. However, we find any such error in this regard to be harmless, considering the overwhelming evidence of defendant's guilt and the absence of any significant probability that the jury would have acquitted defendant but for the error (see generally People v Woolley, 53 AD2d 779, 779 [1976]).
Defendant further challenges County Court's denial of his request to charge assault in the third degree (see Penal Law § 120.00) as a lesser included offense of assault in the first degree. "A defendant is entitled to a lesser included offense charge upon request when (1) 'it is impossible to commit the greater crime without concomitantly committing the lesser offense by the same conduct' and (2) 'there [is] a reasonable view of the evidence to support a finding that the defendant committed the lesser offense but not the greater'" (People v Nisselbeck, 85 AD3d 1206, 1208 [2011], quoting People v Van Norstrand, 85 NY2d 131, 135 [1995]). Here, although it is impossible to commit assault in the first degree without concomitantly committing assault in the third degree (see People v Cruz, 153 AD3d 1271, 1272 [2017], lv denied 30 NY3d 1059 [2017]]; see generally People v Green, 56 NY2d 427, 433 [1982]), there was no reasonable view of the evidence that defendant acted without intent to cause serious injury (see People v Cruz, 153 AD3d at 1272; People v Eagleston, 194 AD2d 623, 623 [1993]) or that the victim's injuries were caused by anything other than a dangerous instrument (see People v Soriano, 121 AD3d 1419, 1423 [2014]; People v Williams, 252 AD2d 823, 824 [1998], lv denied 92 NY2d 1040 [1998]). Accordingly, County Court properly declined to charge assault in the third degree as a lesser included offense of assault in the first degree.
Defendant's remaining contentions do not warrant extended discussion. Defendant's argument that the People improperly elicited testimony that exceeded the scope of County Court's Molineux ruling is unpreserved for our review (see People v Cox, 129 AD3d 1210, 1214 [2015], lv denied 26 NY3d 966 [2015]; People v Williams, 101 AD3d 1730, 1731 [2012], lv denied 21 NY3d 1021 [2013]) and, in any event, is lacking in merit (see People v Vanguilder, 130 AD3d 1247, 1250 [2015], lv denied 27 NY3d 1008 [2016]). To the extent that defendant's brief can be read to raise a claim of ineffective assistance of counsel, upon consideration of the totality of defense counsel's representation, we are satisfied that defendant received meaningful representation (see People v Kalabakas, 183 AD3d 1133, 1145 [2020], lv denied 35 NY3d 1067 [2020]; People v Watson, 174 AD3d 1138, 1141 [2019], lv denied 34 NY3d 955 [2019]). Lastly, with respect to defendant's assertion that the sentence imposed upon him was harsh and excessive, we discern no abuse of discretion or extraordinary circumstances that would justify a reduction of the sentence [*8]in the interest of justice (see People v Campbell, 196 AD3d 834, 840 [2021], lvs denied 37 NY3d 1025 [2021]; People v Coppins, 173 AD3d 1459, 1464 [2019], lv denied 34 NY3d 929 [2019]). As there is no basis upon which to disturb the judgment of conviction, we affirm.
Garry, P.J., Lynch and Reynolds Fitzgerald, JJ., concur.
Colangelo, J. (dissenting).
I respectfully dissent. It is beyond cavil that the constitutional rights of a defendant to counsel and to remain silent are central to our system of justice and to guarantee a fair trial. Accordingly, a prosecutor's violation of those rights by eliciting, on the People's direct case, the fact that a defendant previously invoked those rights has been consistently viewed by the courts with a jaundiced eye, whether the prosecutor acted with intent or inadvertence (see People v Knowles, 42 AD3d 662, 665 [2007] ["It is axiomatic that a defendant's invocation of his (or her) right to counsel during custodial interrogation may not be used against him (or her) by the People as part of their case-in-chief"]; see also People v De George, 73 NY2d 614, 618-619 [1989]; People v Flower, 173 AD3d 1449, 1456 [2019], lv denied 34 NY3d 931 [2019]).
The majority does not take issue with this basic proposition. Where I part company with the majority is with respect to the consequences of this transgression absent a timely curative instruction by the trial court. The majority would have this Court engage in a harmless error analysis, whereas I would follow this Court's articulation in People v Knowles (42 AD3d at 665), rejecting such an analysis if the trial court fails to provide "prompt and emphatic curative instructions that the jury may not draw any adverse inferences from [the] defendant's request for counsel." As County Court failed to do so here, defendant's conviction should be reversed.
In my view, the rights violated by the People at trial are so fundamental and the potential impact of such a violation on the jury so potentially prejudicial that a harmless error analysis does not serve as an adequate safeguard. Whether the People sought to draw the jury's attention to or otherwise capitalize on such statements by defendant is of no moment. The onus is, as it should be, on the trial court to neutralize the effect of the breach of such rights at trial by issuing "prompt and emphatic curative instructions" (id.) — something County Court did not do here. Under such circumstances, this Court should not sanction the last refuge of constitutional violations, the harmless error analysis. As the language of this Court in Knowles implies, whether evidence of guilt, when evaluated on a cold record on appeal, is overwhelming may be seen in a markedly different light by a jury that has the evidence presented to it, free from the taint of the constitutional violation, or, at the very least, its effects attenuated by appropriate judicial intervention. For these reasons, I would reverse and order a new trial[*9].
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: At the close of the People's proof, County Court dismissed the charge of attempted murder in the second degree as unsupported by legally sufficient evidence.

Footnote 2: To the extent that defendant argues that his conviction of criminal possession of a weapon in the third degree is unsupported by legally sufficient evidence, such argument was not preserved by his motion for a trial order of dismissal (see People v Rudge, 185 AD3d 1214, 1214 [2020], lv denied 35 NY3d 1070 [2020]; People v Johnson, 172 AD3d 1628, 1629 n 2 [2019], lv denied 34 NY3d 951 [2019]).

Footnote 3: The victim and his wife testified that, after the incident, efforts were made on defendant's behalf to encourage the victim to recant his statements to police. Following these efforts, the victim made a statement that he was dropping the charges.

Footnote 4: To the extent that People v Knowles (42 AD3d at 664) holds otherwise, that case should no longer be followed.

Footnote 5: Defense counsel should not be permitted to decline a curative instruction and thereby create the possibility of reversible error on appeal.